United States District Court
Eastern District of New York

2:17-cv-06728 (JFB)(ARL)

Josh Berger, individually and on behalf
of all others similarly situated,

Plaintiff,

-against -

MFI Holding Corporation, MFI International, Inc.,
Michael Foods of Delaware, Inc., Michael Foods
Group, Inc., Michael Foods, Inc., Crystal Farms
Refrigerated Distribution Company, Post
Holdings, Inc.

Defendant

MEMORANDUM OF LAW

IN OPPOSITION TO DEFENDANTS' MOTION

TO DISMISS THE FIRST AMENDED COMPLAINT

Levin-Epstein & Associates, P.C.
1 Penn Plaza, Suite 2527
New York, NY 10119
Tel: (212) 792-0046

Sheehan & Associates, P.C.
891 Northern Blvd., Suite 201
Great Neck, NY 11021
Tel: (516) 303-0552

Counsel for Plaintiff

<u>Table of Contents</u>

TABLE OF AUTHORITIES ...........................................................................................................II

INTRODUCTION ........................................................................................................................... 1

I.     THE FAC PLAUSIBLY ALLEGES DECEPTION ............................................................ 1

II.    GBL CLAIMS SHOULD BE SUSTAINED BASED ON THE
       RELATIONSHIP OF BUTTER TO MARGARINE ........................................................... 1

       A.    Factual Support for the FAC's Allegations ............................................................ 2

       B.    The FAC Plausibly Alleged that When Consuming Mashed
             Potatoes, Consumers Will Choose Butter or Margarine, but not Both ................... 4

III.   THE PRESENT FACTS SHOULD BE ANALYZED UNDER THE
       NATURAL-ARTIFICAL BODY OF CASE LAW AND NOT THE "MADE
       WITH" JURISPRUDENCE ................................................................................................ 8

IV.    "MADE WITH BUTTER" AND "FRESH" ARE NOT PREEMPTED ........................... 11

V.     EXPRESS AND IMPLIED WARRANTY CLAIMS SHOULD BE
       SUSTAINED ..................................................................................................................... 15

VI.    FRAUD CLAIMS CONTAIN THE REQUIRED ELEMENTS ...................................... 16

VII.   MOTION TO STRIKE IS PREMATURE ........................................................................ 18

VIII.  PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF ................................ 19

CONCLUSION ............................................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
   No. 09-cv-395, 2010 U.S. Dist. LEXIS 73156, 2010 WL 2925955
   (E.D.N.Y. July 21, 2010) ....................................................................... 9, 14

*Ackerman*, 2013 WL 7044866, ................................................................... 19

*Ault v. J.M. Smucker Co.*,
   No. 13-cv-3409, 2014 WL 1998235 (S.D.N.Y. May 15, 2014) ............................ 14

*Belfiore v. Procter & Gamble Co.*,
   No. 14-cv-4090, 311 F.R.D. 29,
   2015 WL 5781541 (E.D.N.Y. Oct. 5, 2015) ............................................... 8

*Bowring v. Sapporo U.S.A. Inc.*,
   234 F. Supp. 3d 386 (E.D.N.Y. 2017) ..................................................... 11

*Briseno v. ConAgra Foods, Inc.*,
   No. 15-cv-55727, 2017 WL 53421 (9th Cir. Jan. 3, 2017) ................................ 10

*Eidelman v. Sun Prods. Corp.*,
   No. 16-cv-3914, 2017 WL 4277187 (S.D.N.Y. Sept. 25, 2017) ........................... 11

*Fermin v. Pfizer Inc.*,
   215 F. Supp. 3d 209 (E.D.N.Y. 2016) ..................................................... 11

*Fink v. Time Warner Cable*,
   714 F.3d 739 (2d Cir. 2013) ............................................................. 8

*Foman v. Davis*,
   371 U.S. 178 (1962) ..................................................................... 20

*Goshen v. Mutual Life Ins. Co. of N.Y.*,
   774 N.E.2d 1190, 98 N.Y.2d 314 (2002) ................................................... 1

*Greene v. Gerber Products Co.*,
   262 F. Supp. 3d 38 (E.D.N.Y. 2017) ..................................................... 18

*Gubala v. CVS Pharmacy, Inc.*,
   No. 14-cv-09039, 2015 U.S. Dist. LEXIS 77509, 2015 WL 3777627
   (N.D. Ill. June 16, 2015) ............................................................... 14

*In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*,
   588 F. Supp. 2d 527 (S.D.N.Y. 2008) .................................................... 11

*Koehler v. Litehouse, Inc.*,
  No. 12-cv-04055, 2012 WL 6217635 (N.D. Cal. Dec. 13, 2012) .......................................... 19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ........................................................................................... 20

*NML Capital, Ltd. v. Republic of Argentina*,
  No. 05-cv-2434, 2009 WL 1528535
  (S.D.N.Y. May 29, 2009) ................................................................................................ 19

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
  85 N.Y.2d 20 (1995) ......................................................................................................... 1

*Pardini v. Unilever United States, Inc.*,
  961 F. Supp. 2d 1048 (N.D. Cal. 2013) .......................................................................... 14

*Peviani v. Hostess Brands, Inc.*,
  750 F. Supp. 2d 1111 (C.D. Cal. 2010) .......................................................................... 14

*Red v. Kraft Foods, Inc.*,
  No. 10-cv-1028, 2012 WL 5504011 (C.D. Cal. Oct. 25, 2012) ......................................... 9

*Sensible Foods, LLC v. World Gourmet, Inc.*,
  No. 11-cv-2819, 2012 U.S. Dist. LEXIS 21446, 2012 WL 566304 (N.D. Cal. Feb. 21, 2012)
  ........................................................................................................................................ 10

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ........................................................................................... 18

*Sims v. First Consumers Nat. Bank*,
  303 A.D. 2d 288, 758 N.Y.S. 2d 284
  (1st Dept. 2003) ................................................................................................................ 1

*Suez Equity Inv'rs, L.P.  v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ............................................................................................. 15

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
  No. 04-cv-0704, 2009 WL 1456582 (E.D.N.Y. May 22, 2009) ......................................... 16

*Weisblum v. Prophase Labs, Inc.*,
  88 F. Supp. 3d 283 (S.D.N.Y. 2015) ............................................................................... 15

*Williams v. Gerber Prods Co.*,
  552 F.3d 934 (9th Cir. 2008) .......................................................................................... 10

**Other Authorities**

iii

A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science, 2091 (2007) ......................................................................... 5

Brenda Reau,
   *Butter is Gaining Ground with Consumer Demand for Natural Products*, Michigan State University Extension Product Center (Sep. 15, 2011) ............................................ 6

Charles Spence,
   *Comfort Food: A Review*, Intern'l Journal of Gastronomy and Food Science (2017) .............. 6

Geoffrey P. Miller, Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, Cal. Law Review 77 (1989) ........................................................... 3

Libby Copeland, New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine, Smithsonian.com (Nov. 21, 2016) ............................................................... 3

M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made From Designer Fats*, Food Quality and Preference (1999), 147 ................................ 5

Mintel,
   Report on Butter, Margarine and Spreads – US (Aug. 2011) ................................... 6

Nina Martyris, Operation Margarine:  Tracing the Wartime Rise of Ersatz Butter, Harper's Magazine – Blog (May 2, 2014) ................................................................ 3

R. W. Cox, *Competition Between Butter and Margarine*, University of Minnesota Agricultural Experiment Station 5 (1953) ...................................................................... 5

Rebecca Rupp,
   The Butter Wars: When Margarine Was Pink, National Geographic Blog – The Plate (Aug. 13, 2014) ............................................................................................ 4

Ruth Dupré,
   "If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886, Journal of Econ. History, (1999) ............................................................... 4

W. T. Mickle,
   Margarine Legislation, Am. Journal of Agricultural Economics (Aug. 1941) ....................... 4

**Regulations**

21 C.F.R. § 101.65(b)(3) ............................................................................ 12

**Statutes**

N.Y. Gen. Bus. Law § 349 ........................................................................... 1

iv

N.Y. Gen. Bus. Law § 350 ................................................................................................................ 1

**INTRODUCTION**

Plaintiff submits this memorandum of law in opposition to defendant's motion to dismiss the First Amended Complaint ("FAC" or Dkt. No. 23]. Motion to Dismiss and Mem. of Law in Support ("Def. Mem." or referred to herein as "Dkt. 29").

For the reasons below, the motion is without merit, and should be denied it in its entirety.

## I.   THE FAC PLAUSIBLY ALLEGES DECEPTION

The FAC asserts that the Products' representations violate Sections 349 and 350, respectively, of the New York General Business Law ("GBL"), prohibiting "[d]eceptive acts or practices" and "[f]alse advertising." FAC, ¶¶ 97-107.

The purpose of GBL Sections 349 and 350 is "to secure an 'honest market place' where 'trust,' and not deception, prevails." *Goshen v. Mutual Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195, 98 N.Y.2d 314, 324 (2002) (citation omitted). To state a claim pursuant to Sections 349 and 350, a plaintiff must allege that: (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff was injured as a result. *See, e.g.*, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). Whether a particular act or practice is deceptive is intensely-factual, and, therefore, motions to dismiss are disfavored. *See, e.g.*, *Sims v. First Consumers Nat. Bank*, 303 A.D. 2d 288, 289, 758 N.Y.S. 2d 284, 285-286 (1st Dept. 2003).

## II.   GBL CLAIMS SHOULD BE SUSTAINED BASED ON THE RELATIONSHIP OF BUTTER TO MARGARINE

Defendant's opposition is defective because it overlooks the allegations of the FAC which are clear and consistent:  butter and margarine have forever been rival food products unlike any

other foods which have existed.  FAC, ¶ 13 (describing margarine being "invented…as a lower quality butter alternative."), ¶ 12, 14 (contrasting how butter is made – "churning the cream at the top of a cow's milk until the fat solidifies" with margarine, which is produced through chemistry and engineering – "hydrogenation, fractionation and interesterification.").

Defendant states that the FAC must be dismissed because "The truthful highlighting of one ingredient does not reasonably imply the absence of a different ingredient, especially when all ingredients are properly disclosed in the ingredient statement."  Dkt. 29, p.9 citing *Mantikas v. Kellogg Co.*, No. 16-cv-2552, 2017 U.S. Dist. LEXIS 83311, at *4-5, 2017 WL 2371183, at *4-5 (E.D.N.Y. May 31, 2017)

However, the FAC provides detailed factual allegations about the unique butter-margarine relationship, which is more significant than any between whole grain and non-whole grain, providing support for the consumer to believe that "the presence of butter will mean the exclusion of margarine."  FAC, ¶ 21. Moreover, the FAC alleges that one of the central reasons why consumers prefer butter to margarine is because they are "part of different food categories," the former being "natural, simple and minimally processed," while the latter "is the epitome of an artificial and processed food."  FAC, ¶¶ 22-23.

A.    Factual Support for the FAC's Allegations

Defendant's entire opposition is based on the inclusion of margarine in the FDA-required ingredient list.  Dkt. 29, p.9. ("This ingredient statement indicates that the products contain ingredients other than potatoes, butter, and milk.").  The FAC provides factual reasons as to why an ingredient list disclaimer is insufficient here and in support of the claim that "calling out" butter is an affirmative representation that the products do not contain margarine.

2

These reasons include (i) margarine's invention "response to a butter shortage" "as a lower quality butter alternative," (ii) "functionally similar usages" when it comes to their effect on the "naturally dry texture" of potato products, (iii) the contrasting mouthfeel each imparts to a food, (iii) the up and down fortunes of each, relative to the other, in terms of per capita consumption since World War II, (iv) their place in different food categories – simple and nature as opposed to processed and artificial and (v) 171 recipes by ordinary consumers for mashed potatoes that include "butter or margarine" as opposed to 0 that include both.  FAC, ¶¶ 13, 15 18, 22, 32-33.

Less than two decades removed from margarine's creation, Congress passed The Oleomargarine Act of 1886, ch. 840, 24 Stat. 209, which taxed margarine production and defined butter.  *See* Geoffrey P. Miller, <u>Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine</u>, Cal. Law Review 77 (1989), p. 84 at fn 3 (describing the rise of the dairy lobby in response to margarine's introduction to the U.S.).

The subsequent sixty (60) years saw additional taxes on margarine, though its use increased as a result of rationing of butter during both World Wars.  Nina Martyris, <u>Operation Margarine: Tracing the Wartime Rise of Ersatz Butter</u>, Harper's Magazine – Blog (May 2, 2014)[1] (describing the intensity of reactions brought about by replacing butter with margarine and noting "Margarine thrives on adversity, and its origins are rooted in it."); Libby Copeland, <u>New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine</u>, Smithsonian.com (Nov. 21, 2016)[2] ("For decades there's been a huge butter versus margarine debate"); Rebecca Rupp, <u>The Butter Wars: When Margarine Was Pink</u>, National Geographic Blog – The Plate – Serving daily discussions on

---

[1] https://harpers.org/blog/2014/05/operation-margarine/ accessed April 1, 2018
[2] https://www.smithsonianmag.com/science-nature/new-book-clarifies-butters-spread-and-chronicles-its-wars-margarine-180961165/ accessed April 3, 2018

food (Aug. 13, 2014)[3] ("Butter, from its ancient inception, had nothing much in the way of competition until 1869" when margarine was invented; by the 1880s, "'margarine' and 'butter' had become fighting words."); W. T. Mickle, Margarine Legislation, American Journal of Agricultural Economics, (Aug. 1941), pp. 567–583 (noting that in the US, margarine "has been almost from the beginning a center of controversy"); Ruth Dupré, "If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886, Journal of Econ. History, (1999), pp. 353–371.

    B.    The FAC Plausibly Alleged that When Consuming Mashed Potatoes, Consumers Will Choose Butter or Margarine, but not Both

According to defendant, the allegations "about home cooking practices and Internet recipes" not germane to "purchasing a ready-to-eat mashed potato product." Dkt. 29, p. 18. Whether or not a reasonable consumer of ready-to-eat mashed potato products would expect that the purchased product would share certain features with how they would prepare it at home is a question of fact, not suitable for disposition on the present motion.

The FAC provided factual information extracted from the largest and most relevant consumer database in support of its argument that (1) reasonable consumers have strong preferences about butter and margarine, (2) mashed potatoes are expected to include a lipid ingredient such as butter or margarine when faced with the "naturally dry texture of potatoes," and (3) consumers do not expect butter and margarine to be present in the same mashed potato dish, whether made at home or purchased in the store.  FAC, ¶ 18 ("to enhance their texture, viscosity, palatability and to provide lubrication in the mouth."), ¶ 25 ("[Using butter and margarine] would only be done in separate foods (i.e., butter for baking muffins, margarine for preparing vegetables),

---

[3] http://theplate.nationalgeographic.com/2014/08/13/the-butter-wars-when-margarine-was-pink, accessed April 2, 2018

instead of using a bit of each within the same food"), ¶¶ 27-34, ¶ 35 ("There is no expectation by a reasonable consumer that mashed potatoes would be consumed with butter *and* margarine.").

These assumptions are highly reasonable. In fact, food scientists and sociologists who have studied the issue reached similar conclusions. A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science (2007) (in ascertaining the sensory attributes of butter vis-à-vis margarine that caused a person to choose one over the other, determining that "we noted that consumers appeared to fall primarily into 2 groups: butter-only consumers, and margarine + butter consumers. Individuals who consumed margarine on a regular basis quite often used butter for special occasions or for baking."); R. W. Cox, *Competition Between Butter and Margarine*, University of Minnesota Agricultural Experiment Station (1953) (determining that sixty (60) percent of subjects to be "butter only," ten (10) percent as "margarine only" with the remaining thirty (30) percent using each); M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made From Designer Fats*, Food Quality and Preference (1999), 147 at 152 ("When subjects were categorized as butter or margarine users, it became apparent that butter users were more discriminating than margarine users, who had no preference among the spreads.").

The FAC alleges that the representations purport to portray the Products as being comparable to what a consumer would make at home, describing the Products as "comfort food that you can feel comfortable with," as a result of their use of "use of fresh, never frozen real potatoes and real ingredients like milk and butter." FAC, ¶¶ 6-7.

"Comfort foods," according to reasonable consumers, is "Food that provides consolation or a feeling of well-being, typically having a high sugar or carbohydrate content and associated with childhood or <u>home cooking</u>." Oxford Dictionary; The Free Dictionary ("Food that is simply

prepared and associated with a sense of <u>home</u> or contentment"); Merriam-Webster ("food that is satisfying because it is prepared in a simple or traditional way and reminds you of <u>home</u>, family, or friends.");[4] *see also* Charles Spence, *Comfort Food: A Review*, Intern'l Journal of Gastronomy and Food Science (2017) (surveying the literature and describing how comfort foods "tend to be associated with childhood and/or <u>home cooking</u>. Indeed, comfort foods are often prepared in a simple or traditional style and may have a nostalgic or sentimental appeal, perhaps reminding us of home.") (emphases added).

Comfort food is thus "simple" by its nature given its association with home cooking, where a common household cupboard lacks synthetic preservatives such as sodium bisulfite, potassium sorbate and disodium pyrophosphate, all present in the Products. defendant knows that consumers want to purchase products that share as many qualities in common with what they might otherwise prepare at home – "less processed foods with fewer artificial ingredients."  FAC, ¶ 9.

In fact, a 2011 report by Mintel, the leading global market research firm emphasized that the appeal of butter is based on its pure, natural image, dovetailing with preferences towards foods and ingredients without artificial ingredients.  This was consistent with its survey results that indicated 68% of consumers believed that butter substitutes such as margarine contain too many artificial ingredients.  Mintel, <u>Report on Butter, Margarine and Spreads – US</u> (Aug. 2011); *see also*, Brenda Reau, *Butter is Gaining Ground with Consumer Demand for Natural Products*, Michigan State University Extension Product Center (Sep. 15, 2011).[5]

---

[4] https://en.oxforddictionaries.com/definition/comfort_food, https://www.thefreedictionary.com/comfort+food https://www.merriam-webster.com/dictionary/comfort%20food http://wordnetweb.princeton.edu/perl/webwn?s=comfort+food accessed February 24, 2018.
[5] http://msue.anr.msu.edu/news/butter_is_gaining_ground_with_consumer_demand_for_natural_products accessed April 1, 2018.

6

Consumers reasonably expect food manufacturers to make products in a way that is familiar and appealing to them, based upon their typical and normal experiences.  That including "only butter" in the Products is not somehow prevented by technical concerns is evident from the mashed potato products situated adjacent to defendant's in the grocery store, made by Pineland Farms and Bob Evans, shown below.

Front Label             Ingredients



Additionally, the other label elements – "real ingredients like milk and butter," "simple," and "Simply" – comprise "the entire mosaic" and reinforce the impression the Products will only contain butter.  FAC, ¶¶ 6-7, 10-12; *Belfiore v. Procter & Gamble Co.*, No. 14-cv-4090, 311 F.R.D. 29, 38, 2015 WL 5781541, at \*35 (E.D.N.Y. Oct. 5, 2015); *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ( "[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial.").

### III.  THE PRESENT FACTS SHOULD BE ANALYZED UNDER THE NATURAL-ARTIFICIAL BODY OF CASE LAW AND NOT THE "MADE WITH" JURISPRUDENCE

Defendant seeks to escape liability because "all ingredients are properly disclosed in the ingredient statement."  Dkt. 29, p. 16 citing *Mantikas v. Kellogg Co.*, No. 16-cv-2552, 2017 U.S. Dist. LEXIS 83311, at \*10-11, 2017 WL 2371183, at \*10-11 (E.D.N.Y. May 31, 2017).  In *Mantikas*, the plaintiff alleged "MADE WITH WHOLE GRAIN" claim on the front label was misleading.  In finding for defendant, that court did not cite the ingredient list as the basis and

8

instead, relied on that product's front label which "conspicuously states that the Crackers are made with either five (5) or eight (8) grams of whole grain per serving." *Mantikas*, 2017 WL 2371183 at *10-11.

Contrary to defendant's characterizations, the court distinguished that plaintiff's claims' from other leading cases where the ingredient list *was* necessary to "learn the true contents of the products." *Mantikas*, 2017 WL 2371183 at *10-11 citing *Williams v. Gerber Prods Co.*, 552 F.3d 934 (9th Cir. 2008) ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception.") and *Ackerman*, 2010 WL 2925955.

Defendant relies on the body of "made with" ingredient labeling cases, where a plaintiff alleges a product's claim to be "made with" a particular ingredient is misleading because the ingredient is incorporated to the final product in a processed form. *Manchouck v. Mondeléz Int'l Inc.*, No. 13-cv 02148, 2013 U.S. Dist. LEXIS 138877, at *7-9, 2013 WL 5400285, at *7-9 (N.D. Cal. Sept. 26, 2013) ("made with real fruit" not misleading because the products contained fruit, albeit in a puree form suitable to be incorporated into a cookie product); *Henderson v. Gruma Corp.*, No. 10-cv-04173, 2011 U.S. Dist. LEXIS 41077, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) (not misleading for guacamole to claim it was made "with garden vegetables" because it contained the powdered and processed forms of vegetables – "avocado powder, dehydrated onion, garlic powder, and bell pepper" which "can be grown in a garden"); *Red v. Kraft Foods, Inc.*, No. 10-cv-1028, 2012 U.S. Dist. LEXIS 164461, at *10-12, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) (dismissing "made with real vegetables" claim that alleged the products contained a significant amount of fresh vegetables and were healthy because (1) the claim in question did not specify the *amount* of vegetable ingredients in the products and (2) a reasonable consumer knows

that absent any representation to the contrary, crackers are typically made from wheat.); *Sensible Foods, LLC v. World Gourmet, Inc.*, No. 11-cv-2819, 2012 U.S. Dist. LEXIS 21446, at *16-20, 2012 WL 566304, at *16-20 (N.D. Cal. Feb. 21, 2012)(dismissing Lanham Act literal falsity claims that "Veggie" and "Apple" straws were misleading because (1) "it strains the boundaries of the English language" to assert that potatoes were not vegetables and (2) the presence of apples – in a puree form, necessary to be incorporated into the product – was truthful.)

However, the present facts are no different from the numerous cases where one positive claim is understood with a corresponding negative claim. *Briseno v. ConAgra Foods, Inc.*, No. 15-cv-55727, 2017 WL 53421 (9th Cir. Jan. 3, 2017) (rejecting defendant's claim that a reasonable consumer would consider the "100% Natural" label material and understand it to mean GMO-free"); *Segedie v. Hain Celestial Grp., Inc.*, No. 14-cv-5029, 2015 WL 2168374, at *14 (S.D.N.Y. May 7, 2015) ("It is not unreasonable as a matter of law to expect that a product labeled "natural" or "all natural" contains only natural ingredients."); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 459 (E.D.N.Y. 2013) ("[R]easonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."); see also *Silva v. Smucker Nat. Foods, Inc.*, No. 14-cv-6154, 2015 WL 5360022, at *10, n.5 (E.D.N.Y. Sept. 14, 2015) ("An FDA-mandated ingredients list on the back of the label does not inoculate a manufacturer from claims that they misrepresented the product on the front of the label; consumers are not expected to scour a label to ensure that prominent representations are not false.").

The authorities within this Circuit hold that "the presence of a disclaimer or other clarifying language *may* defeat a claim of deception." *Goldemberg v. Johnson & Johnson Consumer Cos.*, Inc., 8 F.Supp.3d 467, 479-80 (S.D.N.Y. 2014) (emphasis in original); *Delgado v. Ocwen Loan*

*Servicing, LLC*, No. 13-cv-4427, 2014 WL 4773991, at *18 (E.D.N.Y. Sept. 24, 2014) (considering font size, placement, emphasis and consistency when evaluating whether a disclaimer is sufficient to prevent a reasonable consumer from being misled)

In contrast to the authorities relied upon by defendant, the disclaimer on the Products here is the solitary word, "margarine" on the ingredient list, in size 4 font. *Fermin v. Pfizer Inc.*, 215 F. Supp. 3d 209, 212 (E.D.N.Y. 2016) (total pill-count was "clearly stated" on the front of the package, making it "impossible to view the products without also reading the total number of pills contained in each package."); *Bowring v. Sapporo U.S.A. Inc.*, 234 F. Supp. 3d 386, 292 (E.D.N.Y. 2017) (concluding that in light of the alleged misrepresentations, defendant's "standalone statement" which clearly and accurately disclosed where the beer was brewed, no reasonable consumer would be misled); *Eidelman v. Sun Prods. Corp.*, No. 16-cv-3914, 2017 WL 4277187 (S.D.N.Y. Sept. 25, 2017) (rejecting defendant's argument that "no reasonable consumer could be misled into believing that the Label indicates that both the brand, and in turn, the brand product bearing the actual Label, are recommended by dermatologists for sensitive skin" even "assuming the entire text of the Label is fully visible and easily read").

## IV.   "MADE WITH BUTTER" AND "FRESH" ARE NOT PREEMPTED

Defendant advances the equivalent of a "get out of jail free card" in claiming that regardless of whether the use of "butter" and "fresh" are misleading, federal law prohibits plaintiff from challenging them. Dkt. 29 at p. 11 quoting *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d. 527, 530, 538 (S.D.N.Y. 2008) (implied preemption is "applicable where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

11

This reliance on preemption is misplaced for several reasons.  First, the only <u>requirements</u> which apply to all food labels are the name of the food (21 C.F.R. § 101.3), the designation of the ingredients (21 C.F.R. § 101.4), manufacturer's name (21 C.F.R. § 101.5), net quantity or size of the product (21 C.F.R. § 101.7) and the nutrition facts (21 C.F.R. § 101.9).

In fact, neither of the relevant federal regulations – 21 C.F.R. § 101.65(b)(3) and 21 C.F.R. § 101.95 – falls under the preemptive umbrella.  Defendant even acknowledges that "[21 C.F.R. § 101.65(b)(3)] makes clear that 'made with real butter' is not an implied nutrient content claim, but instead is a claim that may add value to a product for some consumers."  Dkt. 29, 12; 21 C.F.R. § 101.65(b)(3) ("The following types of label statements are generally <u>not</u> implied nutrient content claims and are <u>not</u> subject to the requirements of § 101.13 and this section: . . . A claim about the presence of an ingredient that is perceived to add value to the product, e.g., "made with real butter.") (emphasis added).

Defendant misapplies preemption in arguing that "made with real butter" and "fresh" are authorized by or in accord with federal regulation, shielding it from GBL §§ 349-350.  Dkt. 29, p.11 ("'made with real butter' complies with Section 343(r) of the FDCA and regulations promulgated by FDA concerning express and implied nutrient content claims"), 14 ("Michael Foods' use of the word "fresh" to describe the potatoes used to make Simply Potatoes products complies with FDA regulations").

With respect to the use of "fresh," implied preemption does not apply because it falls outside of the preemptive scope of 21 U.S.C. 343(r).  58 Fed. Reg. 3, 2401 at 2402-403, Terms that Describe Other Aspects of Food: "Fresh" and Related Terms (Jan. 3, 1993) (21 C.F.R. § 101.95) ("The 1990 amendments [NLEA] do not require that FDA define labeling terms such as "fresh" that do not make nutrient content claims.")

Nevertheless, 21 U.S.C. § 101.95 still sets forth parameters for the use of "fresh" on food labels. Dkt. 29, p.13 quoting 21 U.S.C. § 101.95 ("[t]he term 'fresh,' when used on the label or in labeling of a food in a manner that suggests or implies that the food is unprocessed, means that the food is in its raw state and has not been frozen or subjected to any form of thermal processing or any other form of preservation").

Though the parties agree that "the potatoes (as ingredients) are unprocessed, used in their raw state, and are never frozen," this is insufficient to invoke the defense of preemption. First, as indicated, *supra*, there is no preemption aspect to the "fresh" regulation so it is not logically possible for the Products to "compl[y]" as defendant states. Dkt. 29, p. 14; see 21 U.S.C. § 101.95 ("The terms defined in this section *may* be used on the label or in labeling of a food in conformity with the provisions of this section."). This does not mean that when those terms are used in accordance with that section, it is *prima facie* non-misleading.

Moreover, the FAC alleges the Products are not "fresh" "due to the addition of chemical preservatives." FAC, ¶ 46. The use of preservatives to extend a product's shelf-life yet still label it "fresh" was rejected by the FDA. 58 Fed. Reg. 3, 2401 at 2403 ("However, the agency does not agree that the use of the term "fresh" is appropriate if a food has been subjected to chemical treatments, including but not limited to antioxidants, antimicrobial agents, or preservatives").

Due to the absence of any affirmative requirements imposed by the regulations cited by defendant, there cannot be any implied preemption defense, contrary to defendant's claims. Dkt. 29, p. 12-14 ("To require Michael Foods to "correct" its label…presumably by removing or changing the "made with real butter" statement, would place a requirement on Michael Foods that is inconsistent with the FDCA and FDA implementing regulations…If Plaintiff's state and common law claims relating to "fresh" were to succeed, they would put requirements on Michael

Foods beyond anything required under federal law" citing *Ackerman v. Coca-Cola Co.*, No. 09-cv-395, 2010 U.S. Dist. LEXIS 73156, at *9, 2010 WL 2925955, at *9 (E.D.N.Y. July 21, 2010).

The authorities relied upon by defendant all relate to requirements imposed by law and such are inapposite to those alleged in the FAC.  Dkt. 29, p. 13 citing *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *19, 29 (finding that plaintiff's claim that that the <u>fortification</u> of sugar water – rather than the sugar content itself was barred by preemption); *In re Pepsico, Inc. Bottled Water Mktg.*, 588 F. Supp. 2d. 527 at 537 (recognizing "that in contrast to spring water, <u>the FDA concluded</u> that because purified water, from whatever source, has been treated to meet purity standards, its source is immaterial to reasonable consumers."); *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1054-1056 (N.D. Cal. 2013) (where defendant's <u>calculated serving sizes</u> were consistent with FDA regulations, plaintiff's claims that the products were "fat free" and "zero calorie" were misleading were preempted since these were based on the FDA-mandated serving size"); *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1119 (C.D. Cal. 2010) (<u>display of nutritional information</u> in the manner specified by the FDA cannot be challenged as "misleading" because a plaintiff may not "enjoin the use of the very term permitted by the NLEA and its accompanying regulations"); *Gubala v. CVS Pharmacy, Inc.*, No. 14-cv-09039, 2015 U.S. Dist. LEXIS 77509, at *10-11, 2015 WL 3777627, at *10-11 (N.D. Ill. June 16, 2015) (plaintiff's allegations were preempted where they would require CVS to modify <u>the mandated Nutrition Facts</u> to identify each source of protein when doing so "would not be identical to the labeling requirements imposed by federal law.") (emphases added).

The FAC did not allege defendant could not use the terms "made with real butter" or "fresh" on its labels, only that it was misleading to do so.  *Ault v. J.M. Smucker Co.*, No. 13-cv-3409, 2014 WL 1998235, at *7 (S.D.N.Y. May 15, 2014) (rejecting defendant's attempt to

characterize plaintiff's claim as requiring it to label its products "bioengineered" when the allegations were based on the claim "All Natural," which had "no effect on Defendant's ingredient labeling and therefore cannot conflict with FDA labeling requirements. As a result, "[t]his is not a preempted theory."").

## V.   EXPRESS AND IMPLIED WARRANTY CLAIMS SHOULD BE SUSTAINED

Plaintiff's warranty claims are based upon the Products' representations, including "Made with Real Butter & Milk" which affirmed they did not contain margarine.  FAC, ¶ 92. Defendant's opposition to the express warranty claims – "'made with real butter' is not an affirmation of fact or promise about the absence of margarine."  Dkt. 29 at 20 citing *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 12-md-2413, 2013 U.S. Dist. LEXIS 123824, at *57-60, 2013 WL 4647512, at *57-60 (E.D.N.Y. Aug. 29, 2013).  To the extent defendant's argument is that "made with real butter" constitutes "mere labeling on a package," such a conclusion would be contrary to New York law, in which "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty."  *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *49 (affirming that defendant's labels constituted an express warranty under N.Y.U.C.C. Law § 2-313(1)(a)).

In an attempt at dismissing the implied warranty claims, defendant cites to a lack of privity between the parties and lack of personal injury.  Dkt. 29, p. 21 citing *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 296 (S.D.N.Y. 2015).  However, this overlooks that a privity-like relationship can be established where one party "hold[s] unique or special expertise," sufficient to make the speaker aware that the other party would rely on the information provided to them.  *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001)

Here, defendant's experience and leadership in the potato processing and dairy industries, the products' name ("Simply Potatoes") along with the numerous statements promoting the value-added dairy products, establishes that the equivalent of a privity relationship exists.

## VI. FRAUD CLAIMS CONTAIN THE REQUIRED ELEMENTS

Not only has Plaintiff satisfied the requirements of Fed. R. Civ. P. 8(a), it has also satisfied heightened requirements of Fed. R. Civ. P. 9(b) by adequately pleading the "who, what, when, where, and how of the alleged fraud, noted in the below table. *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009).

|  | FAC Allegations | Paragraph(s) |
|---|---|---|
| Who: | "Michael Foods, Inc. ("defendant") manufactures and sells refrigerated mashed potato products under the "Simply Potatoes" brand (the "Products")" | 1 |
|  | "Michael Foods, Inc. ("Michael Foods") is a Delaware corporation with a principal place of business in Minnetonka, Minnesota" | 78 |
| What: | Defendant "knew that 83% of consumers had the mistaken belief that refrigerated mashed potatoes were fresh" and that "consumers have the mistaken belief they [frozen mashed potatoes] are fresh, even though the very next page [of its marketing document relying on Datassential survey data from February 2014] admits the shelf-life is 50 days" | 41-43, 99 |
| When: | "any Products bearing any of the actionable representations herein during the statutes of limitation periods" | 67 |
| Where: | "The front and back labels declare 'Made From Fresh Potatoes'" | 7 |
|  | "The dual side flaps declare 'We use fresh, never frozen real potatoes'" | 8 |
| How: | Defendant knew: |  |
|  | it could not claim the Products were "fresh" | 40, 103 |
|  | but also knew, "by relying on proprietary survey data" contained "on the second page of defendant's 2014 digital brochure prepared for the food service/restaurant industry" that | 42-44 |

16

| | |
|---|---|
| "By using the word 'fresh' in such a way, coupled with consumer misperception and defendant's knowledge of those mistaken beliefs, reasonable consumers conclude the final product is fresh, or just prepared" | 44, 100-102 |

Defendant erroneously claims that the fraud allegations are directed towards the "made with real butter claims" when in fact they relate to the "made with" and "made from" "fresh potatoes" statements.  Dkt. 29, p.19 ("no affirmative false ingredient claims are alleged, and that margarine is clearly disclosed as an ingredient."); FAC, ¶¶ 97-106.

Despite plaintiff identifying the date, precise text and purpose of the document relied upon, defendant claims that the FAC "fails to allege any facts sufficient to show that Michael Foods believes a consumer misperception exists concerning the freshness of refrigerated potatoes."  Dkt. 29, p.19; FAC, ¶¶ 41-43 (according to defendant's proprietary research, "83% of consumers believe refrigerated potatoes are fresh," identified on "the second page of defendant's 2014 digital brochure prepared for the food service/restaurant industry" relying on Datassential survey data from February 2014.").

Despite defendant's opposition, this "give[s] rise to a strong inference of fraudulent intent," because it establishes that defendant (1) commissioned a research survey regarding mashed potatoes and consumer understanding, (2) designed the methodology thereof, and (3) while in the exclusive possession of the extent and degree to which consumers had erroneous beliefs about the freshness of frozen mashed potatoes, it capitalized on this gap in the public knowledge of frozen potato products.

Further, the representations with respect to "fresh" give rise to an inference of fraudulent intent because there is no legitimate purpose to such claims other than to take advantage of the

aforementioned consumer misperceptions.  FAC, ¶ 101-102 (because all food was fresh *at some point*, it is meaningless to describe the Products in that way).

The FAC has met the "specificity requirement for scienter" imposed by Fed. R. Civ. P. 9(b) since plaintiff has not only "averred generally" as to the source of defendant's knowledge, but rather identified and provided the document in question. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

## VII.   MOTION TO STRIKE IS PREMATURE

Defendant's argument with respect to the nationwide class are conclusory, overbroad and premature. First, defendant's authorities do not stand for the proposition that a court *must* or even should decide issues relating to maintenance of a nationwide class at the pleading stage.  *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *57 ("courts have recognized that this question is <u>usually</u> addressed on a class certification motion") (emphasis added). More recent authorities have emphasized the pattern within the Second Circuit, where there are "common issues of conduct that would establish liability under a number of states' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute."  *Greene v. Gerber Products Co.*, 262 F. Supp. 3d 38, 80 (E.D.N.Y. 2017).

Though defendant asserts that GBL §§ 349-350 are not applicable to purchasers outside of this State, it provides no authority as to any differences between the consumer protection laws of any other state with New York.  *Greene* 262 F. Supp. 3d 38, at 80 ("To the extent that the laws of various states differ, those concerns may be "lessened where the states' laws do not vary materially."").

The question is not whether they actually satisfy predominance, but whether Defendant has demonstrated that it will be impossible—after discovery—for Plaintiffs to satisfy Rule 23. *Motta v. Glob. Contract Servs. Inc.*, No. 15-cv-8555, 2016 WL 2642229, at *5 (S.D.N.Y. May 4, 2016)

Plaintiff identified a number of common questions that can be satisfied with common evidence, including whether defendant's labeling is misleading and whether these claims allowed Defendant to sell the Products at a premium (see, e.g., FAC ¶ 61).  Class certification is therefore possible, at a minimum, and Defendant has failed to meet its burden.

## VIII.  PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF

Defendant failed to address or rebut the issues relating to injunctive relief, leading to the apparent and tacit conclusion that it cannot respond on this issue because it is correct.  *NML Capital, Ltd. v. Republic of Argentina*, No. 05-cv-2434, 2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009) (holding that defendant waived the argument by failing to raise it in its opposition to the plaintiffs' motion).

Plaintiff and reasonable consumers seek to be relieved from Defendant's continuing misleading and deceptive practices in the future, which is no more truthful today than when plaintiff first discovered the alleged deception.  *Ackerman*, 2013 WL 7044866, at *15 n.23; *see also*, *e.g.*, *Koehler v. Litehouse, Inc.*, No. 12-cv-04055, 2012 WL 6217635, at *6–7 (N.D. Cal. Dec. 13, 2012) (plaintiff had standing for injunctive relief claim even though he did not intend to purchase the product as advertised).

## CONCLUSION

Though "a party may amend its pleading only with the opposing party's written consent or the court's leave" after the expiration of time for amendment as a matter of course, the Court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371

U.S. 178, 182 (1962). "[T]he 'permissive standard' of Rule 15 'is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). Plaintiff has not had an opportunity to amend his pleading in response to a Court order evaluating the sufficiency of his allegations. As the Second Circuit observed, "[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley*, 797 F.3d at 190.

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety or in the alternative, grant leave to amend or dismiss without prejudice.

Dated:  April 9, 2018

Respectfully submitted,

Levin-Epstein & Associates, P.C.

 /s/ Joshua Levin-Epstein
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119
Tel: (212) 792-0046
Fax: (212) 563-7108
joshua@levinepstein.com

2:17-cv-06728 (JFB)(ARL)
United States District Court
Eastern District of New York

Josh Berger, individually on behalf of himself and all others similarly situated,

                    Plaintiff,

    - against -


MFI Holding Corporation, MFI International, Inc., Michael Foods of Delaware, Inc., Michael Foods Group, Inc., Michael Foods, Inc., Crystal Farms Refrigerated Distribution Company, Post Holdings, Inc.

                    Defendants

---

Memorandum of Law in Opposition
to Defendant's Motion to Dismiss
the First Amended Complaint

---

Levin-Epstein & Associates, P.C.
1 Penn Plaza
Suite 2527
New York, NY 10119
Tel: (212) 792-0046
Fax: (212) 563-7108
joshua@levinepstein.com

---

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  April 9, 2018


                                /s/ Joshua Levin-Epstein
                                Joshua Levin-Epstein