Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

United States District Court
Eastern District of New York                              2:17-cv-06728-RRM-ARL

| | |
|---|---|
| Josh Berger, individually and on behalf of all others similarly situated | |
| Plaintiffs | Second Amended Complaint |
| - against - | |
| Michael Foods, Inc. | |
| Defendant | |

Plaintiffs by attorneys alleges upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.    Michael Foods, Inc. ("defendant") manufactures, distributes, markets, labels and sells refrigerated ready-to-eat mashed potatoes under the Simply Potatoes brand name ("Products") in containers including 24 and 32 oz. packages

2.    The Products are available to consumers nationwide from brick and mortar and online stores of third parties and/or defendant's website.

3.    The Products are available in no fewer than the following varieties:

- Traditional
- Garlic
- Sour Cream & Chives
- Sweet Potatoes
- Parmesan Peppercorn

4.    The common relevant front representations include

1

(i)     Product name, i.e., Garlic Mashed Potatoes

(ii)    a bowl of hot, fresh mashed potatoes

(iii)   partially melted pat of butter

(iv)     designated flavor, i.e., fresh garlic pieces for Garlic

(v)     vintage-style "Made With Real Butter & Milk" stamp

(vi)    "Made From Fresh Potatoes"

(vii)   Images of uncooked, raw potatoes

 

5.     Examples of the Traditional, Garlic and Sour Cream & Chives are presented below.






6.     The side flaps declare "We use fresh, never frozen real potatoes and real ingredients

like milk and butter.  Finally, comfort food that you can feel comfortable with."



7.    The back panel is below.





Potatoes are one of nature's simplest, most satisfying foods.  We like to keep it that way, using only real, fresh, never frozen potatoes.  So Simply Potatoes are as deliciously easy as they are wholesome.

8.    Defendant has taken affirmative steps for consumers to mistakenly believe the Products contain only butter.

9.    The representations are misleading because despite the centrality of butter to their

marketing and labeling, they surprisingly contain margarine, indicated on the ingredient list.



**INGREDIENTS:** POTATOES, WHOLE MILK, BUTTER (CREAM, SALT), MARGARINE (LIQUID AND HYDROGENATED SOYBEAN OIL, WATER, SALT, CONTAINS LESS THAN 2% OF WHEY SOLIDS, VEGETABLE MONO & DIGLYCERIDES, SOY LECITHIN, SODIUM BENZOATE (PRESERVATIVE), ARTIFICIAL FLAVOR, VITAMIN A PALMITATE ADDED), SALT, CONTAINS ½% OR LESS OF THE FOLLOWING:  DISODIUM PYROPHOSPHATE (ADDED TO MAINTAIN COLOR), POTASSIUM SORBATE AND SODIUM BISULFITE (ADDED TO MAINTAIN FRESHNESS). **CONTAINS MILK AND SOY. PARTIALLY PRODUCED WITH GENETIC ENGINEERING (MARGARINE)**

POTATOES, WHOLE MILK, BUTTER (CREAM, SALT), MARGARINE (LIQUID AND HYDROGENATED SOYBEAN OIL, WATER, SALT, CONTAINS LESS THAN 2% OF WHEY SOLIDS, VEGETABLE MONO & DIGLYCERIDES, SOY LECITHIN, SODIUM BENZOATE (PRESERVATIVE), ARTIFICIAL FLAVOR, VITAMIN A PALMITATE ADDED), SALT, CONTAINS 1/2% OR LESS OF THE FOLLOWING: DISODIUM PYROPHOSPHATE (ADDED TO MAINTAIN COLOR), POTASSIUM SORBATE AND SODIUM BISULFITE (ADDED TO MAINTAIN FRESHNESS)

I.   Butter and Margarine are Products Which Have Similar Functions but Different Qualities

10.    The Products emphasize butter through the label statements, images, and representations.

11.    When consumers eat mashed potatoes, they are typically prepared or consumed with fats and oils, like butter *or* margarine.

12.    This is because potatoes' naturally dry texture requires a fat ingredient to enhance the texture, viscosity and palatability.

13.    This leads to the common dinner table question before digging into mashed potatoes – to choose butter or margarine.

14.     However, when purchasing and consuming defendant's Products, consumers get both despite believing they will only be having butter.

15.     Consumers prefer butter to margarine in general and in potatoes because they prefer butter's:

- unique and unduplicated taste, owing to more than 120 naturally occurring flavor compounds including methyl ketones and lactones;
- ability to enhance the texture and other qualities of (mashed) potato products;
- mouthfeel, since butter melts at a normal body temperature, while margarine has a higher melting point, resulting in a greasy aftertaste on the palate.

16.     Butter is the quintessential natural and simple food, produced by churning the cream at the top of a cow's milk until the fat solidifies.

17.     According to archaeologists, butter was discovered accidentally by nomadic herdsmen of the Neolithic-era, who attached sacks containing milk to their pack animals, which unknowingly was transformed into butter after days of jostling in the harsh steppes.

A.  Margarine Invented as Lower Quality Butter

18.     Margarine was invented in the late 19th century as a response to a butter shortage, at the behest of the French government to develop a lower quality and cheaper butter alternative in the late 19th century.[1]

19.     Margarine consists of vegetable oils which are converted from liquid to solid through hydrogenation, fractionation and interesterification, in the presence of chemical and enzymatic catalysts.

---

[1] J. Bourdieu et al., *"That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266 ("between the expensive, genuine article [butter] and its cheaper surrogate [margarine] ('artificial butter', as it was dubbed) … Margarine, an industrial good, had mimicked the 'natural', time-honored butter ever since its invention in 1869.").

20.     The rivalry between these two foods is unlike any other which has existed, greater than that of any other foods which could allege to be rivals – i.e., grain vs. whole grain, natural fruit vs. fruit with artificial ingredients, organic v. non-organic (conventional).[2]

21.     This was the battle of dairy vs. "vegetables," farm vs. city, natural v. artificial, pastoral v. urban.

22.     From the beginning of margarine's history, those who sold it attempted to trick unwitting consumers, through fortification with Vitamin A and addition of yellow coloring, so consumers would think they were purchasing butter.

23.     This deception was noted by a Supreme Court Justice, Judge John Marshall Harlan, who observed:

> [T]he real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk.[3]

24.     Public authorities, aided by the dairy lobby, sought to protect consumers, and Congress passed The Oleomargarine Act of 1886, which taxed margarine and defined butter.[4]

25.     At the state level, margarine was (1) banned since its artificial yellow color caused it to be intentionally mistaken for, and purchased instead of, butter[5] and (2) required to be dyed pink,

---

[2] Margarine vs. butter: one of history's hottest rivalries?, Rivalry: TMSIDK Episode 17 – Freakonomics, Podcast, 4 June 2017, accessed 12 November 2017; J.H. Young, *"'This Greasy Counterfeit'": Butter Versus Oleomargarine in the United States Congress, 1886*, Bulletin of the History of Medicine, Fall (1979), 53.3, pp. 392-414; J. Bourdieu et al., *"That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266; Distillations Science + Culture + History, Butter vs. Margarine: one of America's most bizarre food battles, Podcast, 14 November 2017.

[3] Michael J. Pettit, *The unwary purchaser: Consumer psychology and the regulation of commerce in America*, Journal of the History of the Behavioral Sciences 43.4 (2007): 379-399.

[4] Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, Cal. Law Review 77 (1989) (describing the rise of the dairy lobby in response to margarine's introduction to the U.S.); W. T. Mickle, *Margarine Legislation*, American Journal of Agricultural Economics (Aug. 1941).

[5] April White, *When Margarine Was Contraband*, JSTOR Daily, 24 Aug. 2017, accessed 15 October 2017; The Butter vs. Margarine Wars Sweep Vermont in 1900, New England Historical Society, accessed 10 November 2017.

red and brown, so that consumers would not confuse it with butter.[6]

B.   Margarine Surpasses Butter in Consumption

26.     The Great Depression and World War II caused margarine consumption to increase, due to its lower cost, and the rationing and shortages of butter.

27.     In the post-war decades, margarine consumption surpassed butter, because of its low price, convenience and public health guidance which warned against saturated fats in butter.

28.     By the mid-1970s, "margarine (and emulsified vegetable oils in general—the naming is complicated, federally regulated, and often inaccurate, so let's just stick with 'margarine') was on quite the roll," outpacing butter three to one.[7]

C.   Resurgence of Butter Due to Changing Scientific Knowledge and Preferences

29.     Gradually, scientists reassessed the harm of saturated fat (butter) and discovered that margarine contained even more harmful trans fats, caused by hydrogenation.

30.     Additionally, scientific consensus shifted from holding fat content responsible for the epidemic of health-related issues as opposed to other food components, such as sugar.

31.     This reassessment of fat – the type and amount consumed in one's diet –

coincided with the country's natural food trends: guided by nutritionists' evolving consensus, consumers became suspicious of highly processed foods full of refined grains, added sugars, and, yes, vegetable oils, all of which bore little resemblance to foods found in the natural world.[8]

---

[6] Rebecca Rupp, *The Butter Wars: When Margarine Was Pink*, National Geographic Blog – The Plate – Serving daily discussions on food (Aug. 13, 2014); see also Ruth Dupré, *"If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886*, Journal of Econ. History, (1999).
[7] TrendSource, Amidst Natural Food Trends, Margarine Becomes Marginal, Oct. 18, 2017.
[8] Amidst Natural Food Trends, Margarine Becomes Marginal, TrendSource, 18 October 2017, accessed 1 October 2018.

## II.  Support for Proposition that Consumers Prefer Butter Instead of Margarine

32.    More significant than any difference between butter and margarine over the exact number of micronutrients or grams of fat is consumers' desires to eschew artificial and synthetic foods in favor of natural and simpler ones – butter, made from cow's milk vis-à-vis margarine, made from industrial vegetable products like soybeans and cottonseeds.

33.    In place of margarine and similar synthetically produced foods, there has been a resurgence of real foods like butter, since it lacks artificial ingredients, added flavoring, preservatives or synthetic substances.[9]

### A.  Food Industry Recognizes Consumers Eat and Expect Butter or Margarine

34.    Margarine has come to epitomize an "undesirable artificiality" due to its shelf-stability and low price.

35.    According to the NYU Professor of Nutrition Marion Nestle,

Margarine has become a marker for cheap, processed, artificial, unhealthy food. The irony is hilarious. Unilever went to a lot of trouble to formulate healthy margarines, but the zeitgeist has caught up with them.[10]

36.    Professor Nestle was referring to the decision by Unilever – the world's largest margarine producer – to divest itself of this product.

37.    Though margarine manufacturers attempted to capture consumer enthusiasm for natural and less processed foods by *adding* butter to margarine, consumers saw through this tactic:

Adding a little butter to the company's margarine wasn't going to change that perception: If people want butter, they want butter.[11]

38.    Even commercial food industry trade publications have recognized that consumers'

---

[9] *Id*.
[10] Why the King of Margarine Wants Out, Justin Fox, Bloomberg, 6 April 2017, accessed 15 November 2017.
[11] *Id*.

affinity for butter is matched by an avoidance of its overly processed and artificial competitors, with Food Ingredients First noting:

> Consumers are also increasingly looking for natural products that taste good and they want to understand the ingredient list of their foods. Butter is as natural as it gets, made of just cream, or cream and salt – so butter offers food manufacturers the ability to have a clean, understandable ingredients list on their products.[12]

39.     Food Business News echoed the pro-butter sentiment, reporting that:

> Butter is back as a growing number of consumers turn their backs to foods perceived as artificial, such as vegetable oil-based margarine. Fresh from the farm, and churned the same way for generations, butter's comeback may be attributed to its simplicity and its deliciousness.[13]

40.     One food industry executive pointed out that "Butter consumption is up 25% in the last 10 years" and that "Butter is benefiting from consumers' desire for fresh, real and natural products," while demand for margarine continues to reach new depths.[14]

41.     The comments of the Bonnie Liebman, Director of Nutrition at the Center for Science in the Public Interest, on consumer perceptions of these two products were apt: "Butter has a more natural image. I think people have always been a bit suspicious about margarine."

42.     According to Mintel, the leading global market research firm, part of the reason for butter consumption now exceeding margarine is because 68% of consumers recognize butter as pure, natural, simple and minimally processed.[15]

B.   <u>Scientific Research Shows Consumers Do Not Expect to Consume Butter and Margarine Together</u>

---

[12] <u>Butter: A healthy fat or fad?</u>, Food Ingredients First, 10 April 2018, accessed 24 June 2018.
[13] <u>Butter innovations churning retail sales</u>, Donna Berry, Food Business News, 14 June 2016, accessed 19 September 2018.
[14] <u>Id.</u>
[15] Mintel, *Report on Butter, Margarine and Spreads – US (Aug. 2011)*; Brenda Reau, <u>*Butter is Gaining Ground with Consumer Demand for Natural Products*</u>, Michigan State University Extension Product Center (Sep. 15, 2011).

43.    Food scientists who have studied the usage of butter vis-à-vis margarine confirmed consumers who prefer butter are averse to margarine, noting that "consumers appeared to fall primarily into two groups: butter-only consumers, and margarine + butter consumers," because margarine loyalists "often used butter for special occasions or for baking."[16]

44.    Another study came to a similar conclusion – though margarine users are open to having butter, those who prefer butter are unlikely to use margarine.[17]

45.    The studies support the notion that it is misleading to promote a product containing butter that also contains margarine due to the consumer expectations and preferences associated with these foods.

### C.    Anecdotal and Cultural Support for Notion that Consumers Expect Butter or Margarine

46.    Consumers' strong preferences for butter or margarine has not just been highlighted by food industry executives, journalists and scientists, but by social commentators.[18]

47.    One commentator described her experiences in a way which would seem familiar to Americans:

> I was hosting a dinner party for friends once, when someone asked me to pass the butter. The woman, a neighbor, hesitated for a moment, and then asked if it was butter or margarine.
>
> "Butter," I said.
>
> "Oh, good," she said.
>
> Someone else nodded in agreement. Another declared he hadn't had margarine in

---

[16] A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science (2007).

[17] M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made from Designer Fats*, Food Quality and Preference (1999).

[18] Nina Martyris, *Operation Margarine: Tracing the Wartime Rise of Ersatz Butter*, Harper's Magazine – Blog (May 2, 2014) (describing the intensity of reactions brought about by replacing butter with margarine and noting "Margarine thrives on adversity, and its origins are rooted in it."); Libby Copeland, *New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine*, Smithsonian.com (Nov. 21, 2016)  ("For decades there's been a huge butter versus margarine debate").

years.

Soon the margarine-bashing began. The color: too yellow. The texture: waxy. A friend's husband went so far as to say he always knew what kind of house he was in by the butter or butter substitute they served, and those homes that served butter substitutes would not have him as guest again anytime soon. You'd think someone had mentioned taxes or lutefisk, so palpable was the disgust.[19]

48.    The differences between consumer's preferences about these ingredients is illustrated by the Products' own ingredient list, which lists the sub-ingredients of butter and margarine.

49.    Butter contains just cream and salt, while margarine contains a host of ingredients requiring a chemistry textbook to understand.[20]

|        Butter        |                     Margarine                     |
| -------------------- | ------------------------------------------------- |
| • Cream<br>• Salt    | • Liquid and Hydrogenated Soybean Oil<br>• Water<br>• Salt<br>• Contains Less than 2% of<br>   o Whey Solids<br>   o Vegetable Mono & Diglycerides<br>   o Soy Lecithin<br>   o Sodium Benzoate<br>   o Artificial Flavor<br>   o Vitamin A Palmitate Added |

D.    Consumer Preferences for Butter Instead of, and Separately from Margarine, Shown from Data About How Consumers Eat Mashed Potatoes

50.    Consumers reasonably expect food manufacturers to make products in a way that is familiar and appealing to them, based upon their typical experiences making foods at home and ingredient preferences and they have responded, reformulating products to match this demand.

---

[19] Paula Carter, *Margarine: A Public and Personal History*, The Rumpus, Aug. 2 2013, accessed 23 November 2017.
[20] Supra, note 7 and 8.

51.     Natural Products Insider described what consumers expect when purchasing a product like the mashed potatoes of defendant – "[A] ready-made dish that requires simple heating takes the pressure off a busy weeknight, but for an increasing number of consumers, it also must have a *homemade character*." (emphasis added).[21]

52.     To the extent reasonable consumers consume butter *and* margarine, this would only be done in separate foods (i.e., butter for baking muffins, margarine for vegetables), instead of using a bit of each within the same food.

53.     This is common sense, and similar to how most people would prefer watching an entire movie (even a bad film) instead of seeing half of two highly regarded movies – variety is not always preferred.

54.     These preferences are borne out by looking at how average people eat mashed potatoes, through a review of Allrecipes.com, the leading user-generated recipe site, in terms of visitors and submitted recipes, according to the Alexa.com, the premier commercial internet traffic data and analytics firm, and eBizMBA.com, which combines data from Alexa with other similar services such as Compete and Quantcast.[22]

55.     A search of available data indicates that when people prepare mashed potatoes, they will use butter or margarine, as opposed to both.

56.     This is shown and can be replicated by visiting google.com and entering the two combinations of Search Terms 1 and 2 followed by "site:allrecipes.com/recipe," as shown below.[23]

| Subdomain URL | Search Term 1 | Search Term 2 | Results |
|---|---|---|---|
| site:allrecipes.com/recipe | "mashed potatoes" | "butter or margarine" | 171 |
| | | "butter and margarine" | 0 |

---

[21] Cindy Hazen, Addressing Texture Challenges in Clean Label Prepared Foods, Natural Products Insider, 3 July 2018,
[22] According to the Alexa.com, the premier commercial internet traffic data firm, and eBizMBA.com, which combines data from Alexa with other similar services such as Compete and Quantcase.
[23] Accessed January 23, 2018

13

57.   When "mashed potatoes" is combined with "butter or margarine," Allrecipes.com retrieves 171 distinct, user-generated recipes which include "mashed potatoes" in the name (i.e., Whipped Mashed Potatoes, Rosemary Mashed Potatoes, etc.).

58.   In contrast, where "mashed potatoes" is combined with "butter and margarine," Allrecipes.com is <u>unable to locate a single entry</u>.

59.   This illustrates that when consumers have mashed potatoes, they will seek a version which has butter or margarine, but never both.

60.   This illustrates that when consumers have mashed potatoes either at home, at a restaurant or buying them already prepared at a store, they will seek a version which has butter or margarine, but never both.

61.   There is no expectation by a reasonable consumer that mashed potatoes would be consumed with butter and margarine – the front label declaration of butter is the de facto exclusion of margarine.

III. The Products Contain Less Butter Than Advertised

62.   The front label of the Products contains a pat of butter, equivalent to half a tablespoon.[24]

63.   Half a tablespoon of butter contains on average 3.5% of the daily value of Vitamin A, illustrated through calculations based on USDA Nutrition Database information.[25]

---

[24] https://www.basenjimom.com/pat-of-butter/
[25] https://www.nutritionix.com/i/usda/butter-salted-1-tbsp/513fceb375b8dbbc21000003





64.     The Products are misleading because they do not contain the equivalent of a pat of butter per serving, because the Nutrition Facts reveals they only have 2% of Vitamin A.

65.     Moreover, the amount of Vitamin A in the Products is not even derived exclusively from butter, but as "Vitamin A Palmitate Added."

IV. The Representations are Misleading as to the "Fresh" Qualities of the Products

66.     The Products make extensive use of the term "fresh" in a misleading and deceptive manner.

67.     "Fresh" is one of the most valued descriptive food terms to consumers and its application differs depending on the product type and expectations.

68.     For mashed potatoes, a reasonable consumer understands "fresh" to mean they were "just prepared."

69.    "Fresh" is used in a way to suggest or imply the food is unprocessed in its raw state and has not been frozen or subjected to any form of thermal processing or any other form of preservation.[26]

70.    This is because mashed potatoes do not spring from the earth – there must be human and mechanical intervention to convert a whole potato to the mashed form.

71.    Defendant relies heavily on the term "fresh" – "Made from Fresh Potatoes" and made using "fresh, never frozen real potatoes" – though it never actually claims the Products are "fresh."

72.    Defendant does not make such a claim because to do so would be egregious – after all, the Products are highly processed and contain numerous chemical preservatives.

73.    Instead, defendant relies on the fact that "83% of consumers believe refrigerated potatoes are fresh," relying on proprietary Datassential survey data from February 2014.

74.    This figure is promoted on the second page of defendant's 2016 digital brochure entitled, "Everything You Need," prepared not for consumers, but for the food service/restaurant industry.  Exhibit A, annexed hereto.

75.    This figure is also highlighted in a similar brochure of defendant's in 2014.  Exhibit B, annexed hereto.

76.    These materials were directed not to consumers, but to food service providers, and stated: "fresh matters. 93% of consumers rate freshness of food as important to selecting a restaurant.* 83% of consumers believe refrigerated potatoes are fresh.*" (emphasis added).

77.    Defendant urges the industry to purchase its mashed potato products because consumers have the mistaken belief they are fresh, even though the very next page admits the shelf-life is 50 days.

---

[26] 21 C.F.R. § 101.95.

78.   By using the word "fresh" in such a way, coupled with consumer misperception and defendant's knowledge of those mistaken beliefs, reasonable consumers conclude the final product is fresh, or just prepared.

79.   "Fresh" refrigerated mashed potatoes exist, sold in grocery stores which sell the defendant's Products, in close proximity.

80.   For mashed potatoes, a reasonable consumer understands "fresh" to mean they were "just prepared."

81.   Store-made and sold mashed potatoes have a limited shelf-life and are fresh because they lack chemical preservatives, including sodium benzoate, disodium pyrophosphate, potassium sorbate and sodium bisulfite.

82.   Mass marketed refrigerated potato products such as Simply Potatoes cannot be fresh because fresh mashed potatoes have a shelf-life between 7 and 10 days.

83.   The Products' shelf life of at least 50 days (up to 90) is due to the addition of chemical preservatives – sodium bisulfite, potassium sorbate and disodium pyrophosphate.

84.   These preservatives change the essential nature of an uncomplicated food – basic mashed potatoes (what consumers want) – to an artificial product they would avoid if they knew the truth.

85.   Sodium bisulfite, a compound, artificial preservative, is used to slow the non-enzymatic browning of the Products and is made by reacting sulfur dioxide gas, $SO_2$, in a solution containing sodium hydroxide, $NaOH$, or sodium carbonate, $Na_2 CO_3$.

86.   Potassium sorbate, which inhibits microbial growth, is made through adding potassium carbonate to a solution of sorbic acid in a solvent of acetone, heating the mixture to reflux temperature and recovering potassium sorbate from the reaction mixture.

87. Disodium pyrophosphate prevents and reverses naturally occurring discoloration, or "after-cooking darkening, and is made through treating phosphoric acid with a sodium compound.

88. These preservatives change the nature of an uncomplicated, and potentially fresh food – basic mashed potatoes (what consumers want) – to an artificial product they would avoid if they knew the truth.

89. A reasonable consumer expects where a product is named "Simply Potatoes," emphasizes its "simplicity," and prominently claims the presence of "Real Butter & Milk," that product will only contain potatoes, butter, milk and those variations in the Product line (i.e., garlic, sour cream).

90. Such an expectation is consistent with the how consumers understand the word "simply," which is "merely" or "just," as in "just potatoes."

V. Consumers Do Not Expect a Simple, Uncomplicated Product Like Mashed Potatoes to Contain GMOs

91. In addition to the artificial preservatives which belie the Products' claim to simplicity, the margarine is made from genetically modified organisms (GMOs).

92. Monsanto, the largest global producer of genetically modified seeds has described GMOs as "Plants or animals that have had their genetic makeup altered," whereby "genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."

93. The Environmental Protection Agency ("EPA") has distinguished conventional breeding, occurring through cross-pollination, from genetic engineering using modern scientific techniques.

For a plant-incorporated pesticide, one would breed a plant that produces a pesticide with a sexually compatible plant that does not possess this property but possesses other properties of interest to the breeder, e.g., sweeter fruit. Then, out of the offspring, the breeder would choose the offspring plant that produces the pesticide, and therefore expresses the desired pesticidal trait, as well as producing sweeter fruit.

Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material. For example, a desired gene that produces a desired pesticide [] (e.g., the insecticidal protein Bt from the bacterium, Bacillus thuringiensis) can be isolated from another organism, such as a bacterium, and then inserted into a plant. The desired gene becomes part of the plant's DNA. The plant then expresses the incorporated gene and produces the pesticidal protein as it would one of its own components.

94.    Conventional breeding entails sexual and asexual reproduction to develop new plant varieties through selection, and only seeks to achieve expression of genetic material already present within a species

95.    Genetic engineering requires insertion of unrelated genetic material, followed up by selection of the varieties.

## VI. Composition of Products and Misleading Names

96.    The Products' ingredient list contains butter, a milkfat and margarine, made from vegetable oils.

97.    In industrial and commercial usage, it is not practical to add butter and margarine to a food separately, as would be done in the home.

98.    The reasons why this is not done on an industrial level is because mixing and blending of the milkfat and vegetable oils would cause a deterioration in quality and present complications as to melting properties, plasticity and water content.[27]

---

[27] Anna M. Fearon, "Butter and butter products," in Dairy ingredients for food processing (2011): 199-224, Ed. Ramesh C. Chandan, Wiley (2011)

99.   This means that when the Products are being prepared, butter and margarine are likely added as part of the same ingredient.

100.   While defendant correctly listed the ingredients on the ingredient list by separating their components and placing them in order of descending predominance by weight, the promotion of butter only on the front label, without its margarine component, is misleading because it does not accurately identify or describe the basic nature of the butter and margarine blend.

101.   This is the principle contained in 21 C.F.R. §102.5(a) which requires food be designated by a common or usual name that is not misleading.

102.   Margarine is defined by Section 347 of the FDCA, and is a mixture of (1) edible fats and/or oils, (2) various aqueous phase ingredients including water, milk or milk products, (3) Vitamin A (15,000 IU) and optional ingredients such as (1) salt, (2) emulsifiers and (3) flavoring substances.[28]

103.   The Products are more appropriately identified as Mashed Potatoes made with (1) "Real Butter-Margarine Blend" or (2) Imitation Margarine.

104.   The labeling of a food with two or more ingredients is misleading by designation of such food with a name which includes or suggests the name of one but not all ingredients, even though the names of all such ingredients are stated elsewhere in the labeling.[29]

105.   The Products contain butter and margarine and their name only suggests butter, even though margarine is listed on the back of the package.

106.   The labeling and appearance of the Products creates an erroneous impression that butter and milk constitute the entirety of the fats used, and that they are present in an amount greater than is actually the case.

---

[28] 21 C.F.R. §166.110(a) ("Margarine.").
[29] 21 C.F.R. § 101.18(b)

107.   The proportion of this component has a material bearing on price or consumer acceptance of the Products because it is more expensive and desired by consumers.

108.   It is misleading to promote butter on the front label because consumers even if the ingredients are added to the food separately, consumers are accustomed to butter products and foods which contain butter to prominently disclose the presence of margarine or vegetable oils not on the back of the label on the ingredient list, but on the front of the label, shown in the below examples.



VII. Artificial Flavor in Margarine Makes Front Label Butter Claims Especially Misleading

109.   The Products' ingredient list reveals that one of the sub-ingredients of the margarine is "artificial flavor."

110.   Assuming the artificial flavor is in the semblance of butter, it is not required to be

"declared as part of the name of the food in accordance with §101.22."[30]

111.   This means defendant is not required to declare artificial flavor on the front label.

112.   However, it is misleading not to indicate artificial flavor on the front label for multiple reasons.

113.   First, because the Products are promoting butter on front label and fail to indicate the presence of margarine anywhere other than the ingredient list, the consumer will believe the flavor derives exclusively from butter.

114.   While margarine is permitted to contain artificial butter flavor and not declare it on the front label, butter is not permitted to have artificial flavor nor would butter require artificial flavor.

115.   This analysis is consistent with FDA's thinking as evinced in Compliance Policy Guide, CPG Sec. 505.200 "Butter" Featured in Product Name, March 1988.

BACKGROUND:

There have been inquiries as to what is required to feature the word "butter" in the labeling of a product as "Butter Cookies," "Butter Shortbread," etc.

POLICY:

The Food and Drug Administration will consider a name "Butter _____ " or the use of the word butter in conjunction with the name as false and misleading unless all of the shortening ingredient is butter. If the product contains both butter and shortening but a sufficient amount of butter to give a characteristic butter flavor to the product, an appropriate name would be "butter flavored _____." However, if the product contains any artificial butter flavor it would have to be labeled in compliance with 21 CFR 101.22(i)(2). (highlighting added)

116.   While the application of this CPG is intended to address the use of the word butter as part of a product name, the explanation provided offers insight for labeling of butter and artificial flavor outside of the specific context provided for by the margarine standard of identity.

---

[30] 21 C.F.R. §166.110(b)(7)

117.   The CPG addresses a situation where a product has butter but also a "shortening" component, which refers to solidified vegetable oils.

118.   The example considers a scenario where a butter-shortening combination ingredient "contains any artificial butter flavor" and states "it would have to be labeled in compliance with 21 CFR 101.22(i)(2)."

119.   This is because the failure to declare the presence of artificial flavor, even if it is in the semblance of butter, will cause the consumer to expect the food to contain more butter than it actually does.

120.   Thus, declaring artificial flavor on the front label of such a product is required so the consumer will be alerted to the presence of non-butter fat components and not think the entire fat component is butter.

121.   The definition of butter established by Congress does not permit "natural flavor" to be added to the food known as butter.[31]

VIII.     Products are Misleading Because Descriptions are not Uniform Among Similar Foods

122.   Competitor refrigerated mashed potatoes of Hormel Foods and Pineland Farms adjacent to defendant's on grocery shelves, below, only use butter, which indicates there are no technological challenges in food processing which necessitate the use of vegetable oil alternatives.

<u>Front Label</u>                                                 <u>Ingredients</u>

---

[31] 21 U.S. Code § 321a. "Butter" defined



INGREDIENTS: COOKED POTATOES (POTATOES, WATER), MILK WITH VITAMIN D3, BUTTER (CREAM AND SALT), CONTAINS 2% OR LESS OF CREAM, SALT, ANTIMICROBIAL BLEND (MALTODEXTRIN, CULTURED DEXTROSE, SODIUM DIACETATE, NISIN PREPARATION [SALT, NISIN], EGG WHITE LYSOZYME], POTASSIUM SORBATE (PRESERVATIVE), WATER, TITANIUM DIOXIDE (COLOR), SODIUM ACID PYROPHOSPHATE, SPICE, FLAVORING.

Ingredients: Cooked Potatoes (Potatoes, Water), Milk with Vitamin D3, Butter (Cream and Salt), Contains 2% or less of Cream, Salt, Antimicrobial Blend (Maltodextrin, Cultured Dextrose, Sodium Diacetate, Nisin Preparation [Salt, Nisin], Egg White Lysozyme), Potassium Sorbate (Preservative), Water, Titanium Dioxide (Color), Sodium Acid Pyrophosphate, Spice, Flavoring.



INGREDIENTS: POTATOES, WHOLE MILK, BUTTER, WATER, SALT, CULTURED DEXTROSE.

Ingredients: Potatoes, Whole Milk, Butter, Water, Salt, Cultured Dextrose.

123.  The Products' descriptions are misleading because it is not uniform among all identical or similar products where butter is the exclusive fat or oil source.

124.  Where two similarly labeled products are situated in the same category or section of a store and their representations as to quality and fill are identical yet the former is lacking the quantity of the characterizing ingredient (butter) or qualities (absence of ingredients not associated with the characterizing ingredients – margarine), the reasonable consumer will be deceived.

125. They will and did pay more money for the defendant's Products under false impression it was labeled consistently with other similar products, which are actually substantively different and contain greater amounts and percentage of the characterizing and desired ingredients, *viz*, butter.

IX. Conclusion

126. Had Plaintiff and Class members known the truth about the Products, they would not have bought the Products or would have paid less for it.

127. The Products contain other representations which are misleading and deceptive.

128. As a result of the false and misleading labeling, the Products are sold at premium prices – no less than $2.99 per 24 oz excluding tax – compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

129. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(d)(2).

130. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

131. Personal jurisdiction over defendant is because it conducts and transacts business, contracts to supply and supplies goods within this state.

132. Venue is based on plaintiffs and many class members residing in this District and defendant doing business in this district and state.

133. A substantial part of events and omissions giving rise to the claims occurred in this district.

<u>Parties</u>

134.   Plaintiffs purchased the Products or Services in their respective States so designated.

135.   Plaintiffs seek to represent national and state sub-classes of consumers in the states where they purchased the products or services which may include the States where they (i) presently reside, (ii) previously resided, within the relevant statutes of limitations and (iii) regularly engage in consumer transactions due to proximity to state line, i.e., residing on the border of North and South Dakota, such that they would regularly purchase products or services in the state other than where they reside.

136.   Plaintiff Josh Berger is a citizen of New York, Nassau County.

137.   Plaintiff John Solak is a citizen of New York, Broome County.

138.   Plaintiff Christopher Lemke is a citizen of Wisconsin, Waukesha County.

139.   Plaintiff Angela Wade is a citizen of Florida, Charlotte County.

140.   Jane Doe plaintiffs are citizens of the 44 states for which the identity of a named plaintiff has not been disclosed, but who were affected in the same manner as the Named Plaintiffs.

141.   The allegations as related to laws of other states where no named plaintiff has been disclosed serves as a placeholder upon joinder or amendment.

142.   Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.

143.   During the class period, Named and Jane Doe Plaintiffs purchased one or more of the Products or Services for personal use, consumption or application, based on the representations described herein, for no less than the price indicated, *supra*, excluding tax, within the states designated.

144.   Plaintiffs paid a premium relative to similar products because prior to purchase, they (i) saw and relied on the front label claim that the Products were "Made With Real Butter & Milk,"

(ii) never observed anyone eating mashed potatoes with butter or margarine on any occasion where mashed potatoes were served, (iii) only observed people choosing butter or margarine to use on their mashed potatoes and (iv) preferred to consume butter over margarine because it is a natural product with minimal processing and no chemicals.

145.   Plaintiff believed the Products were fresh because he was unaware that mashed potatoes could be refrigerated and yet have a shelf-life of up to three months.

146.   Plaintiff desired to purchase a product that was free from chemical preservatives and GMOs and believed that because the Products were named "Simply Potatoes" and the front label emphasized "Real Butter & Milk," it would not have such components since that would be incompatible with a "simple" dish.

147.   Named and Jane Doe Plaintiffs would consider purchasing the Products again if there were assurances that the Products' representations were no longer misleading.

<u>Class Allegations</u>

148.   The classes will consist of all consumers in all 50 states with sub-classes for the states where Named Plaintiffs have been identified: New York, Wisconsin, Florida, Wisconsin.

149.   Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if Plaintiffs and class members are entitled to damages.

150.   Plaintiffs' claims and the basis for relief are typical to other members because all were subjected to the same representations.

151.   Plaintiffs are adequate representatives because their interests do not conflict with other members.

152.   No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

153.  Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest.

154.  Plaintiffs' counsel is competent and experienced in complex class action litigation

and intends to adequately and fairly protect class members' interests.

155.  Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350, California Consumers
Legal Remedies Act, Civ. Code §§ 1750-1785 ("CLRA")
and Consumer Protection Statutes of Other States and Territories

156.  Named Plaintiffs and Jane Doe Plaintiffs assert causes of action under the consumer

protection statutes of the all 50 states, with Named Plaintiffs asserting the consumer protection

laws of their individual states.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;
b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;
c. Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521 *et. seq.*;
d. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;
e. California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* and Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200- 17210 *et. seq.*;
f. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;
g. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;
h. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;
i. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;
j. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes* § 501.201, *et. seq.*;
k. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;
l. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;
m. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;
n. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;
o. Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1 *et. seq.*;
p. Iowa Code §§ 714.16 *et. seq.*;
q. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;
r. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat Ann § 365.020, *et. seq.*;
s. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;
t. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform

Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;

u. Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101 *et seq.*;

v. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws Ch. 93A;

w. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;

x. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et. seq.*;

y. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;

z. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;

aa. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;

bb. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;

cc. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;

dd. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;

ee. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;

ff. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;

gg. New York General Business Law ("GBL") §§ 349 & 350;

hh. North Carolina General Statutes Chapter 75: Monopolies, Trusts and Consumer Protection, N.C. Gen. Stat. §§ 75-1.1 through 75-35;

ii. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;

jj. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;

kk. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;

ll. Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);

mm. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et. seq.*;

nn. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;

oo. South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;

pp. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;

qq. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.*;

rr. Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 *et. seq.*;

ss. Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 *et. seq.*;

tt. Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;

uu. Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 *et. seq.*;

vv. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;

ww. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;

xx. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*; and

yy. Wyoming Consumer Protection Act, Wyo. Stat. Ann.§§ 40-12-101 *et. seq.*;

157. Named and Jane Doe Plaintiffs and class members assert causes of action under the consumer protection laws of their States.

158. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair

because the representations give consumers the impression the Products (1) contain more of the characterizing ingredient than they actually do, (2) does not contain ingredients consumers consider the "opposite" of the characterizing ingredients, (3) contain flavor imparted exclusively through the characterizing ingredient and not enhanced by added flavors, artificial or natural, (4) are fresh, as in just prepared, due to placement of Products at retail-level adjacent or in reasonable proximity.

159.  The representations – "Made with Real Butter & Milk," "Simply," "simple," "simplest" and "fresh" are false and misleading.

160.  This is because no reasonable consumer would expect a product touting the presence of "real butter" to contain that specific product which is essentially the opposite product of butter – margarine.

161.  It is false and misleading to represent the Products as "simple" when they contain margarine, an artificial product in its own right, that is also made from GMOs.

162.  Defendant's partial, voluntary disclosures and fail to state additional or qualifying matter with respect to what they did say certain representations may be literally true so far as they go, they are nonetheless misleading

163.  Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

164.  Plaintiffs and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

165.  Plaintiffs reasonably believed based on defendant's representations that the Products would not contain ingredients reasonable consumers do not find compatible, were fresh, and did not contain added flavoring, not mentioned on the front label.

166.   Named Plaintiffs and Jane Doe Plaintiffs and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product or service type.

167.   After mailing appropriate notice and demand, Named and/or Jane Doe Plaintiffs who reside in a State where notice is required prior to seeking damages under that State's Consumer Protection Statutes, will have mailed and/or have amended this complaint to request damages. Cal. Civil Code § 1782(a), (d); Mass. UDAP, Mass. Gen Laws Ch. 93A, etc.

168.   Named and/or Jane Doe Plaintiffs from California will seek injunctive and equitable relief and attorney fees for that State's sub-class for CLRA violations. Civ. Code § 1780(a); Cal. Bus. & Prof. Code § 17203.

169.   The representations and omissions were relied on by Named and Jane Doe Plaintiffs and class members, who paid more than they would have, causing damages.

<u>Negligent Misrepresentation</u>

170.   Plaintiffs incorporate by reference all preceding paragraphs.

171.   Defendant   misrepresented   the   misrepresented   the   substantive,   quality, compositional, health, organoleptic attributes of the Products through representing the characterizing ingredient was present in greater amount than it actually was and/or was the exclusive fat ingredient in the Products.

172.   Defendant misrepresented the composition of the Products (1) by highlighting butter, giving consumers the impression that they only contained butter to the exclusion of butter opposites, since consumers do not use butter and margarine in mashed potatoes and (2) implying the Products were fresh, which took advantage of mistaken consumer beliefs, when the Products are not fresh.

173.   Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

174.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge in the production, service and/or sale of the product type.

175.   The representations took advantage of cognitive shortcuts made by consumers at the point-of-sale and their trust placed in defendant.

176.   Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

177.   Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability,
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

178.   Named Plaintiffs and Jane Doe Plaintiffs incorporate by reference all preceding paragraphs.

179.   Defendant manufactures and sells products which contain characterizing ingredients, flavors and/or qualities which were sought by Plaintiffs and class members.

180.   The Products warranted to Plaintiffs and class members they possessed substantive, compositional, organoleptic, sensory, physical and/or other attributes when they did not.

181.   As a result, the Products lacked those attributes which are present in mashed potato products which contain butter to the exclusion of margarine, and which are fresh when this was not truthful and was misleading.

182.  Since it is not plausible to eat mashed potatoes with butter and margarine, no reasonable consumer would expect the Products to contain margarine.

183.  Defendant had a duty to disclose and/or provide a non-deceptive description of the Products and knew or should have known same were false or misleading.

184.  This duty is based, in part, on defendant's position as one of the largest users of the characterizing ingredient or flavor in the world.

185.  Named Plaintiffs and Jane Doe Plaintiffs desired to purchase products which were as described by defendant.

186.  The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions and were not merchantable.

187.  To the extent notice may be required, Plaintiffs either have sent or intend to send notice to defendant and/or retailers and reserve all rights to amendment of the complaint.

188.  Plaintiffs and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

189.  Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

190.  Defendant described the Products as being "made with" and "made from" "fresh potatoes."

191.  Defendant knew that 83% of consumers had the mistaken belief that refrigerated mashed potatoes were fresh.

192.  The only legitimate purpose of including the claims that the Products are "Made From" fresh potatoes was to reinforce this erroneous consumer belief.

193.  By itself, describe a food as being "Made From" an ingredient that was fresh at one particular point – is meaningless.

194.  This is because all food was fresh at some previous time in the past, either after it was harvested or following its conversion into an edible food.

195.  Defendant's intent in making the "Made From" and "made with" "fresh potatoes" claims was to skirt a patently and obviously false claim, by relying on proprietary survey data and take advantage of consumer's mistaken beliefs.

196.  Plaintiff and class members were part of the over 90% of consumers who value and pay more for a fresh product and part of the 83% of consumers who believed refrigerated mashed potato products were fresh, as in "just prepared" or prepared within a time period which would not have required the use of chemical preservatives to extend their shelf-life to up to three months.

197.  Plaintiff and class members observed defendant's front label claim that the Products were "Made From Fresh Potatoes" and thereby believed the Products themselves were fresh.

198.  Defendant's purpose was to sell a product which contained a valuable and desired characterizing ingredient and/or flavor, butter, and represent the Products were exclusively or predominantly provided the palatability and flavor attributes from that food, contained sufficient independent amounts of same such that they would accurately be described by defendant's claims, and did not contain ingredients or components which consumers do not mix together in this type of food.

199.  Defendant's intent in making the "Made with Real Butter Milk" and "fresh" claims was to take advantage of consumers' common expectations, which do not expect mashed potatoes to have butter and margarine and wrongly think refrigerated mashed potatoes are fresh.

200.  Defendant's actions were motivated by increasing their market share amongst the

many rival mashed potato companies.

201.  Defendant's purpose was to sell a product which contained a valuable characterizing ingredient, flavor or qualities (i.e., absence of ingredients consumers consider opposite to characterizing ingredient) and represent the Products contained sufficient independent amounts of said ingredient or flavor or qualities.

202.  Defendant's fraudulent intent is evinced by its failure to adequately ascertain how consumers think about refrigerated, mass-produced mashed potatoes and indicating a specific amount of butter was contained in a serving of the Products.

203.  Named Plaintiffs and Jane Doe Plaintiffs and class members observed and relied on defendant's omissions and claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

204.  Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

205. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

   **WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4.  Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:    August 9, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

2:17-cv-06728-RRM-ARL
United States District Court
Eastern District of New York

Josh Berger individually and on behalf of all others similarly situated

Plaintiff

- against -

Michael Foods, Inc.

Defendant

## Second Amended Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  August 9, 2019

/s/ Spencer Sheehan
Spencer Sheehan